[Cite as *State v. Potts*, 2018-Ohio-540.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No.    16CA010911 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| NICHALOS POTTS | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No.    15CR091956 |

DECISION AND JOURNAL ENTRY

Dated: February 12, 2018

**{¶1}** CARR, Judge.

**{¶2}** Defendant-Appellant Nichalos Potts appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.

I.

**{¶3}** In July 2015, Potts was indicted on one count of attempted murder, two counts of felonious assault, two counts of aggravated robbery, and two counts of tampering with evidence. All but one of the counts of tampering with evidence included a firearms specification. The charges stemmed from a shooting that happened the night of December 23, 2014, outside an abandoned residence on Gary Avenue. Potts' friend, Kashaun Sibley, was separately indicted based upon his alleged participation in the crimes. Potts' brother, who was also tied to the crimes, pleaded guilty to two felonies and a misdemeanor, including complicity to commit felonious assault, in exchange for his testimony against Potts and Sibley.

{¶4} The matters were consolidated for purposes of trial, at which Potts and Sibley were represented by the same attorney. Ultimately, the jury found Potts guilty of all of the charges. Potts filed a motion for a new trial, which was subsequently denied. Thereafter, Potts was sentenced to an aggregate term of 17 years in prison.

{¶5} Potts has appealed, raising four assignments of error for our review, which will be addressed out of sequence to facilitate our analysis.

II.

### ASSIGNMENT OF ERROR IV

THE VERDICTS FOR ATTEMPTED MURDER, AGGRAVATED ROBBERY, FELONIOUS ASSAULT, AND TAMPERING WITH EVIDENCE, AS DEFINED BY THE COURT, IN COUNTS ONE, TWO, THREE, FOUR, FIVE, AND SIX WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶6} Potts argues in his fourth assignment of error that the verdicts for attempted murder, felonious assault, aggravated robbery, and tampering with evidence are against the manifest weight of the evidence. Potts essentially argues that the State's witnesses were not credible and the weight of the evidence does not support that Potts committed the offenses.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v.*

*Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{**¶7**} Potts' brother, who was sometimes known as "Rome," first met the victim sometime late in 2014. Potts' brother was walking to McDonald's and the victim, who was driving, noticed Potts' brother and thought he knew him. The victim pulled up near Potts' brother and began talking to him. The victim realized he did not know Potts' brother but the two started talking about marijuana, as the victim was looking for a supplier. Potts' brother told the victim that he could help the victim with that. The two exchanged phone numbers at that time. However, Potts' brother had to put the information in Potts' phone as Potts' brother was using Potts' phone because Potts' brother did not have a phone. Potts' brother testified that, at one point, the victim sent Potts' brother text messages that Potts' brother interpreted as being of a sexual nature and that evidenced that the victim was gay. Potts' brother did not respond to those texts.

{**¶8**} On December 23, 2014, Potts' brother went over to Potts' house and asked Potts to get him a bottle of liquor. Potts informed his brother that the victim had texted Potts and was "trying to hook up or whatever[.]" Potts, Potts' brother, and Sibley, whom Potts' brother knew as Tushay, went to JR Foods. Potts parked the truck on a nearby street and told his brother that they were going to rob the victim because Potts had heard the victim had some money. Potts pulled a gun out of the side of the middle console and put it in his pants. Potts' brother told Potts that he was not going to do it, but Potts told him that he had to because the victim knew Potts' brother. The three walked down Gary Avenue to an abandoned residence that was part of a duplex. Potts' brother told police that he also noticed that Sibley had a gun. Potts texted the victim and told him where to go. Then the three waited on the back porch of the residence.

{¶9} The resident from the other half of the duplex came home that evening to find three people wearing black hoodies sitting on the porch in the backyard. He did not know who they were. He said hello to them and they said they were waiting on their friend. The resident then went inside. A couple minutes later he heard four or five gunshots and heard someone screaming that he had been shot. The resident then saw a man fall in the resident's front yard. The resident called 911 but did not go outside. He did, however, observe a car pull up, and saw a large black man get out, check on the victim, and then leave.

{¶10} Matthew Day was driving down Gary Avenue going to visit someone who lived across the street from the crime scene. When he pulled up to the scene, he saw three or four men standing in the front yard talking. Day then saw flashes and heard gunshots and the three or four men took off running towards Homewood. Day then noticed the victim and proceeded to provide aid and called for an ambulance. Once Day could hear the ambulance getting close, Day left.

{¶11} Potts' brother described the events that took place once the victim arrived. Potts' brother was waiting for the victim on the sidewalk and walked with him down the driveway. Sibley was waiting on the back porch and Potts was waiting on the side of the house next door. When they got halfway down the driveway, both Potts and Sibley ran at the victim and someone said "give it up." Potts' brother then heard gunshots and ran. Potts' brother told police that both Potts and Sibley were pointing guns at the victim. Pott's brother saw the victim fall and heard him screaming. Potts and his brother ran towards Homewood and Potts tossed the gun a couple houses down. The two went to Mario Escobar's and Corinna Magrum's house.

{¶12} Michael Casella was sitting on his friend's porch on the night of the shooting when he heard at least two gunshots and ran towards Gary Avenue. There he saw three men

running. The men paused near Michal McCoy's house and then shortly thereafter two of the men kept going straight and one turned off towards the right. The next day, Michael McCoy found a pistol outside his house and sold it for money and drugs. Law enforcement officers contacted Michel McCoy about the weapon but were unable to recover it.

{¶13} Magrum testified that she and her boyfriend, Escobar, were drug addicts at the time of the events at issue, but both Magrum and Escobar denied being high at the time Potts and his brother arrived at their house. Both had prior criminal records. They both knew Potts and Sibley, as Potts and Sibley sold drugs to them. According to Magrum, that night, Potts came running into the house and kept saying that he needed to get up to the bathroom to get his clothes off and he asked for chemicals like bleach to use to clean himself. Both Potts and his brother began scrubbing themselves with bleach and gave their clothes to Magrum. Magrum washed both of their clothes. Potts' brother told the police that, while they were there, he overhead Potts say, "Did you see me shoot him[?]" Magrum remembered hearing "them saying they had to get gun residue off their hands, they shot at somebody or shot a gun." Magrum testified that while Sibley did come to the house, he stayed outside, and Potts and his brother later left with Sibley. Escobar testified that Sibley did come in the house but did not arrive with Potts and Potts' brother and instead came later. While Potts and Sibley were upstairs, Escobar overheard Potts telling Sibley that Potts "popped him." Escobar testified that Potts and Sibley were picked up by a van. Escobar acknowledged that his felony charge was reduced to a misdemeanor in exchange for his testimony.

{¶14} The victim's version of events differed fairly significantly from Potts' brother's version. The victim agreed that he met Potts' brother, whom he knew as Rome, in late 2014 when he mistook Potts' brother for an old friend. The two talked about marijuana and

exchanged numbers. According to the victim, Potts' brother sent the victim sexual messages but the victim declined Potts' brother's advances. On December 23, 2014, the victim received some texts from the number he associated with Potts' brother's phone asking if he could hang out. The victim agreed to do so. The victim stopped and picked up a bottle of alcohol and headed to the address he was provided on Gary Avenue. The victim called when he arrived to clarify the location of the house and was told to park on the street.

{¶15} The victim was met by someone who "look[ed] a little different" than he remembered. That person was very quiet on their walk up the driveway. When they got to the point where they would turn left to go into the house, "a gentleman pulled up from * * * on the stump, and looked [him] in his face and said, 'We got you[.]'" The victim started running and was yelling and screaming and then collapsed in the front yard. He saw two individuals running from the scene. At first the victim did not realize he had been shot but he shortly thereafter discovered the bullet hole in his abdomen area. The victim testified that a man came up to him with a cell phone and told the victim that the man would call the police. The victim was thereafter taken to a hospital. The bullet damaged the victim's kidneys and spine and his injuries required a lengthy hospital stay.

{¶16} At trial, the victim identified Sibley as the only shooter and Potts as the individual who walked the victim down the driveway. However, the victim acknowledged that he told the police on more than one occasion that it was the man he knew as Rome, Potts' brother, who walked him down the driveway. Prior to trial, the victim learned that three people were suspected of being involved, including Sibley and Potts, and began to investigate them on Facebook. It was only at trial that the victim identified Sibley as the shooter and Potts as the individual who walked him down the driveway. While one of the victim's prior interviews with

police was played for the jury in support of defense counsel's cross-examination, that evidence was not admitted into evidence and is not in the record before this Court.

{¶17} Cielo Rodriguez, a police officer with the Lorain Police Department responded to the scene. He encountered the victim in a front yard of Gary Avenue, which he came to discover was next to the yard where the shooting took place. The victim's wallet was found some distance from the victim along with keys and a bottle of liquor. At trial, the victim additionally identified his red hat and glasses as being among the items strewn about the crime scene. The victim told Officer Rodriguez that he came to Gary Avenue to meet someone he knew as Rome. He and Rome walked up the driveway and the victim was confronted by an unknown black man who told the victim to "hold on," pointed a gun at the victim, and shot him twice. The victim ran to the front yard, fell, and then crawled to a neighboring yard.

{¶18} Mark McCoy, then a detective with the Lorain Police Department, investigated the crime scene. He located 5 cartridge casings; three were found in the back area of the property and two were found in the driveway. The cartridge casings and the bullet recovered from the victim were submitted to the Ohio Bureau of Criminal Identification ("BCI"). A forensic scientist with the BCI who worked in the firearms section determined that all five cartridge casings were .380 auto-fired cartridge cases and the bullet was consistent with a .380 auto-fired bullet. Three of the cartridge casings were fired from one gun and two of the cartridge casings were fired from another gun.

{¶19} The FBI also became involved in the investigation. Special agents were able to determine that the phone associated with the phone number that the victim believed belonged to Rome was used by both Potts and Potts' brother. On the night of the shooting, the phone was in the vicinity of Gary Avenue during the time of the shooting.

{¶20} Potts and Sibley testified in their defense. They denied any involvement in the crimes and denied ever meeting the victim. However, they admitted to selling drugs. Potts testified that he often lent his phone to his brother for sometimes hours at a time. Potts admitted to going over to Magrum's and Escobar's house on December 23, 2014, but said he did so around noon to sell them drugs and did not return there that day. Sibley denied spending any time with Potts or Potts' brother on December 23, 2014.

{¶21} On appeal, Potts asserts the verdicts are against the weight of the evidence because the State's witnesses were not credible. Potts points out that the victim's version of events was inconsistent with Potts' brother's version of events and even contradicted what the victim earlier reported to the police. Thus, according to Potts, the jury should not have believed what the victim had to say about Potts' and Sibley's involvement. Potts also notes that Potts' brother's testimony should be viewed with suspicion in light of the deal that Potts' brother struck with the State in exchange for his testimony. Potts points to similar issues with Magrum's and Escobar's testimony.

{¶22} After a thorough review of the record, we cannot say that the jury's verdicts were against the manifest weight of the evidence based upon Potts' arguments. The jury was instructed on complicity and was aware that it could find Potts guilty of the crimes as the principal offender or if it concluded that Potts solicited another to commit the offenses, aided or abetted another in committing the offenses, conspired with another to commit the offenses, or caused an innocent or irresponsible person to commit the offenses.

{¶23} The jury was aware that many of the State's witnesses had criminal records and engaged in illegal activity. The jury was also aware that some of the witnesses received plea deals from the State in exchange for their testimony. Nonetheless, we remain mindful that the

jury had an opportunity to view the witnesses and "was in the best position to assess the credibility of the evidence presented by the parties at trial." *State v. Klingel*, 9th Dist. Lorain No. 15CA010876, 2017-Ohio-1183, ¶ 22. "[T]his Court will not overturn the [] verdict[s] on a manifest weight of the evidence challenge simply because the jury chose to believe certain witnesses' testimony." (Internal quotations and citations omitted.) *State v. Binford*, 9th Dist. Summit No. 27950, 2016-Ohio-7678, ¶ 10. To the extent that Potts challenges the reliability of the victim's testimony, we note that the victim's interview with police that was played for the jury during defense counsel's cross-examination of the victim was not admitted into evidence and is not in this Court's record. Accordingly, this Court cannot evaluate the credibility of the victim to the same extent the jury could.

{¶24} The jury could have reasonably found Potts' brother's testimony credible in light of other witness testimony that it heard and likewise could have reasonably questioned some or all of the victim's testimony in light of the stressful circumstances the victim confronted. *See State v. Sibley*, 9th Dist. Lorain No. 16CA010908, 2017-Ohio-7015, ¶ 31 (noting that "the trier of fact is free to believe all, part, or none of the testimony of each witness.") (Internal quotations and citations omitted.) If the jury believed Potts' brother's testimony and that of several of the other witnesses, the jury could have reasonably concluded that Potts conspired with Sibley to rob the victim and that both Sibley and Potts shot at the victim during what the jury could have reasonably found to be a robbery. There is no dispute that the victim was shot during the events of that evening or that the cartridge casings found at the scene were fired from two different weapons. There was also evidence that Potts discarded a weapon while he was fleeing the crime scene and scrubbed his body in an effort to remove gunshot residue from his person. Considering the totality of the evidence presented, Potts has not established that the jury lost its

way in finding Potts guilty of attempted murder, two counts of felonious assault, two counts of aggravated robbery, and two counts of tampering with evidence.

**{¶25}** Potts' fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE VERDICT FOR AGGRAVATED ROBBERY IN COUNTS TWO AND THREE WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**{¶26}** Potts argues in his third assignment of error that his convictions for aggravated robbery were based upon insufficient evidence. Specifically, Potts contends that there was insufficient evidence that Potts took anything from the victim or attempted to take anything from the victim.

**{¶27}** When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus.

**{¶28}** Potts was found guilty of two counts of aggravated robbery, one in violation of R.C. 2911.01(A)(1) and one in violation of R.C. 2911.01(A)(3).

**{¶29}** R.C. 2911.01(A) states in relevant part:

No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * *

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

{¶30} As discussed above, Potts' brother testified that Potts told Potts' brother that the three of them were going to rob the victim because Potts had heard that the victim had some money. Potts texted the victim with the details of where to meet. According to Potts' brother, Potts took a gun out of the truck and put it in his pants and the three walked to the abandoned house on Gary Avenue to wait for the victim to arrive. As Potts' brother was walking the victim down the driveway, Potts and Sibley ran at the victim and someone shouted, "give it up." Potts' brother told police that both Potts and Sibley pointed guns at the victim. Shots were fired and the victim was shot. Police discovered the victim's wallet and keys a distance from where the victim was found. The victim also identified his hat and glasses as being among the objects strewn about the crime scene. Moreover, there was testimony that Potts discarded the gun while fleeing and then proceeded to scrub his arms with bleach to remove gunshot residue.

{¶31} Considering the foregoing in a light most favorable to the prosecution, we conclude that the State presented sufficient evidence from which a jury could reasonably conclude that Potts committed two counts of aggravated robbery. There was testimony that Potts planned, along with Sibley and Potts' brother, to rob the victim by luring him to an abandoned house. There was also testimony that Potts took a gun with him, ran at the victim upon his approach, and that someone in the group told the victim to "give it up." The victim was then shot. During the investigation, the victim's wallet was found on the ground a distance away from the victim. From the evidence, the jury could have reasonably found that, at the very least, Potts attempted to commit a theft offense, or was complicit in the attempt to do so. *See Sibley*,

2017-Ohio-7015, ¶ 20, quoting *State v. Mitchell*, 10th Dist. Franklin No. 10AP-756, 2011-Ohio-3818, ¶ 26 ("'It is not necessary * * * that a theft actually be completed for an aggravated robbery to occur because, as clearly indicated by R.C. 2911.01, an attempted theft is sufficient.'"). During that attempt, the jury could have likewise concluded that Potts, either as the principal or acting in complicity with Sibley and Potts' brother, brandished, displayed, indicated possession of, or used a firearm and caused, or attempted to cause, serious physical harm to the victim. *See* R.C. 2911.01(A)(1),(3). Thus, in light of Potts' limited argument, we determine there was sufficient evidence to support the aggravated robbery convictions. *See Sibley* at ¶ 20.

{¶32} Potts third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE DUAL REPRESENTATION OF APPELLANT NICHALOS POTTS AND KASHAUN SIBLEY WAS A CONFLICT OF INTEREST AND CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶33} Potts argues in his first assignment of error that his trial counsel's representation of both Potts and Sibley at the consolidated trial was a conflict of interest that amounted to ineffective assistance of counsel. In so doing, he appears to also challenge the extent of the hearing the trial court had on the subject, arguing that "the court was too conciliatory toward the [D]efendants" and that the trial court's expression of concern about possible delays that would result if a conflict did arise later "might have deterred [] Potts from requesting new counsel."

{¶34} "The Sixth Amendment right to assistance of counsel embraces the correlative right to representation that is free from conflicts of interest." *State v. Worrell*, 9th Dist. Summit Nos. 23378, 23409, 2007-Ohio-7058, ¶ 23. "[W]here a trial court knows or reasonably should know of an attorney's possible conflict of interest in the representation of a person charged with

a crime, the trial court has an affirmative duty to inquire whether a conflict of interest actually exists." *Id.* at ¶ 25, quoting *State v. Gillard*, 64 Ohio St.3d 304, 311(1992). "Where a trial court breaches its affirmative duty to inquire, a criminal defendant's rights to counsel and to a fair trial are impermissibly imperiled and prejudice or adverse effect will be presumed." (Internal quotations and citations omitted.) *Worrell* at ¶ 25.

**{¶35}** Here, we conclude that the trial court met its initial duty to inquire into whether a conflict existed. At the time that Potts' trial counsel filed his notice of appearance, he notified the trial court that he was also representing Sibley. Potts' trial counsel attached a signed potential conflict waiver form to his notice of appearance. "The State subsequently made a motion to prohibit defense counsel from representing both Potts and Sibley due to a potential conflict of interest stemming from the dual representation. The trial court held a hearing on the State's motion, at which time the trial court conducted an extensive inquiry concerning the potential conflict of interest." *Sibley*, 2017-Ohio-7015, at ¶ 10. The trial court addressed trial counsel and asked questions of both Potts and Sibley individually. The trial court pointed out some of the possible issues that could arise by having the same attorney represent both of them. Trial counsel maintained that he did not believe that there would be any conflict. Both Potts and Sibley asserted that they wanted to be represented by the same attorney, notwithstanding the information provided by the trial court. Nonetheless, "[t]he trial court allowed Potts and Sibley 'to think about [the dual representation] over the weekend.' When neither [] indicated the following week that they wished to reconsider the dual representation, the trial court ruled, over the State's objection, that Potts and Sibley could be represented by the same attorney." *Id.* Given the foregoing, we cannot say that the trial court failed to adequately investigate any potential conflict. *See Worrell* at ¶ 26.

{¶36} Potts also argues that there was an actual conflict of interest, thereby establishing trial counsel's ineffective assistance. We note that Potts did not object at trial to the joint representation.

{¶37} "'In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.'" *Worrell*, 2007-Ohio-7058, at ¶ 23, quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "To establish the constitutional predicate for a claim of ineffective assistance of counsel, a defendant must show that his counsel actively represented conflicting interests. A defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." (Internal citation omitted.) *Worrell* at ¶ 23.

{¶38} This Court has stated that

> [a]n actual conflict of interest, for purposes of the Sixth Amendment, is a conflict of interest that adversely affects counsel's performance. Thus, to prove an actual conflict of interest, the defendant must show that his counsel actively represented conflicting interests, and that the conflict actually affected the adequacy of his representation. In order to show such a conflict, a defendant must point to specific instances in the record to suggest an actual conflict or impairment of [his] interests. An adverse effect is established where the defendant points to some plausible alternative defense strategy or tactic [that] could have been pursued, but was not because of the actual conflict impairing counsel's performance. While it is not necessary to prove that the defense theory would have been successful, it is necessary to show that the alternative theory was viable. Additionally, an appellant must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

(Internal quotations and citations omitted.) *State v. Jackson*, 9th Dist. Summit No. 27478, 2015-Ohio-4356, ¶ 13; *see also Sibley* at ¶ 9.

{¶39} Potts' argument is somewhat difficult to follow. The essence of Potts' argument seems to be that Potts would have received better, more focused representation if Potts was

represented by an attorney who only had to address Potts' interests. Potts does not appear to assert that trial counsel entirely failed to pursue a strategy, argument, or defense because of a conflict, *see Jackson* at ¶ 13, but instead seems to argue that trial counsel could have more fully pursued the strategies, arguments, or defenses that benefited Potts had he only represented Potts. However, the very nature of dual representation during a consolidated trial requires that one attorney represents the interests of two defendants. If we were to agree with Potts' vague, unclear argument, we would have to conclude that essentially all dual representations involving joint trials create actual conflicts of interest. Potts has pointed to no authority creating such a general bar. *See Worrell,* 2007-Ohio-7058, at ¶ 24 ("Joint representation of multiple defendants is not per se violative of the constitutional guarantee of effective assistance of counsel."). Further, we note that Potts has failed to cite to specific instances in the record demonstrating that trial counsel failed to adequately cross-examine a witness or fully develop an argument due to a conflict. *See Jackson* at ¶ 13 ("In order to show such a conflict, a defendant must point to specific instances in the record to suggest an actual conflict or impairment of [his] interests."). Potts has not explained how anything trial counsel allegedly did in support of only Sibley's case harmed Potts' case. Both Potts and Sibley testified at trial and asserted that they were not involved in the shooting and were not at the crime scene at the time the crimes occurred. Neither Potts nor Sibley implicated the other in the crimes. Accordingly, based on Potts' argument and the record before us, we cannot say that Potts has demonstrated that trial counsel's dual representation forced him to act in a way to defend Sibley that was contrary to his duty to defend Potts. *Jackson* at ¶ 12. Potts' first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE CONSOLIDATION OF APPELLANT NICHALOS POTTS['] AND KASHAUN SIBLEY'S TRIALS, WITHOUT INQUIRY BY THE COURT AS

TO THE RISK THAT WOULD BE UNDERTAKEN BY MR. POTTS, AMOUNTED TO PLAIN ERROR.

**{¶40}** Potts argues in his second assignment of error that the trial court erred in consolidating Potts' and Sibley's trials without holding a hearing to inquire into the risk that such a consolidation would pose to Potts. Potts notes that he never objected to the absence of a hearing or the consolidation and thus is limited to arguing plain error on appeal. *See* Crim.R. 52(B).

**{¶41}** The record reflects that, at some point, early in the proceedings, the State moved to consolidate Potts' case and Sibley's case for trial. There is no written motion in the record, but the subject of the State's motion to consolidate was mentioned during a couple of pretrial hearings. During the August 6, 2015 hearing, the prosecution raised the fact that the motion to consolidate remained pending and stated that the prosecutor and defense counsel thought "it might be premature to hear that [issue] right now." The trial court agreed and noted that once the parties thought "the issue [was] ripe for suggestion" then they should present it to the court and the court would put the matter on the docket for a hearing. The record before this Court does not contain a journal entry resolving the issue or indicate that any hearing was held. Nonetheless, the cases were tried together.

**{¶42}** "[T]he accused bears the burden of proof to demonstrate plain error on the record * * * and must show an error, i.e., a deviation from a legal rule that constitutes an obvious defect in the trial proceedings[.]" (Internal quotations and citations omitted.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22. "However, even if the error is obvious, it must have affected substantial rights, and [w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." (Internal quotations and citations omitted.) *Id*.

"The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice * * *." (Emphasis omitted.) *Id*.

**{¶43}** Pursuant to Crim.R. 13, "[t]he court may order two or more indictments or informations or both to be tried together, if the offenses or the defendants could have been joined in a single indictment or information." "Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct." Crim.R. 8(B). Pursuant to Crim.R. 14, "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires."

**{¶44}** Potts' argument is essentially a reiteration of the argument in his first assignment of error. He maintains he was prejudiced by the consolidation because his counsel had to divide his focus between issues related to Potts and issues related to Sibley. While such may have been a basis for Potts to prefer a separate trial, Potts has not demonstrated that, assuming the trial court had held a hearing and inquired into the issue, Potts would have been legally entitled to severance. *See State v. Greathouse*, 9th Dist. Summit No. 27782, 2017-Ohio-6870, ¶ 18 (discussing the standard for determining when severance is warranted). Accordingly, Potts has not demonstrated that the trial court's failure to hold a hearing and inquire into the issue amounted to plain error. Potts' second assignment of error is overruled.

III.

{¶45} Potts' assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

BRIAN J. DARLING, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and ELIZABETH LINDBERG, Assistant Prosecuting Attorney, for Appellee.